1  RILEY A. CLAYTON
   Nevada Bar No. 5260
2  CHRISTOPHER L. BENNER
   Nevada Bar No. 8963
3
   **HALL JAFFE & CLAYTON, LLP**
4  7455 WEST WASHINGTON AVE., SUITE 460
   LAS VEGAS, NEVADA 89128
5  (702) 316-4111
   FAX (702) 316-4114
6
   Attorney for Third-Party Defendants
7  MICHAEL B. JONES and
   MCMILLEN, URICK, TOCCI & FOUSE
8
                **UNITED STATES DISTRICT COURT**
9
                    **DISTRICT OF NEVADA**
10

11  BEATRICE MARIE SALVATI, AS
    EXECUTRIX OF THE ESTATE OF
12  ERNEST SALVATI, JR., DECEASED, AND
    IN HER OWN RIGHT; GREGORY          CASE NO. CV-S-05-0811-RCJ-LRL
13  SALVATI, and LISA MARIE MANNION,

14            Plaintiffs,              **THIRD PARTY DEFENDANTS' MOTION
                                       FOR SUMMARY JUDGMENT ON THE
15  vs.                                THIRD PARTY COMPLAINT**

16  CAL J. POTTER, III; and CAL J. POTTER,  **AND**
    III, ESQ., CHTD. d/b/a POTTER LAW
17  OFFICES, a Nevada Corporation; DOES I   **THIRD PARTY DEFENDANTS' MOTION
    through X, Inclusive; and ROE            FOR SUMMARY JUDGMENT ON THE
18  CORPORATIONS, I through X, Inclusive,    PLAINTIFFS' COMPLAINT.**

19            Defendants.

20  ─────────────────────────────────       **ORAL ARGUMENT REQUESTED**

21  CAL J. POTTER, III; and CAL J. POTTER,
    III, ESQ., CHTD. d/b/a POTTER LAW
    OFFICES, a Nevada Corporation;
22
              Third Party Plaintiffs,
23
    vs.
24
    MICHAEL B. JONES; MCMILLEN,
25  URICK, TOCCI & FOUSE; ALBERT D.
    MASSI; ALBERT L. MASSI, LTD.; and
26  DOES A-Z, Inclusive,

27            Third Party Defendants.

28  ─────────────────────────────────

1    Third Party Defendants, Michael B. Jones and McMillen, Urick, Tocci & Fouse

2  (collectively referred to as the "McMillen Firm"), by and through their attorneys of record, Hall Jaffe &

3  Clayton, LLP, hereby submit two respective motions for summary judgment.

4    Specifically, the McMillen Firm seeks summary judgment on all claims asserted against it

5  in the third-party complaint, i.e., equitable indemnity and contribution.  In sum, the McMillen Firm is

6  entitled to summary judgment on the equitable indemnity claim because **the McMillen Firm had**

7  **absolutely no involvement in the alleged conduct that spawned the present legal malpractice**

8  **action, i.e., the purported failure to name Allied Security as a defendant in the underlying**

9  **wrongful death action**.  Instead, the undisputed facts establish that the third-party plaintiffs, Cal J.

10  Potter, III and Cal J. Potter, Esq. Chtd. dba Potter Law Office (collectively referred to as "Potter"), made

11  the unilateral decision not to name Allied Security.  Thus, assuming that it was malpractice for Allied

12  Security not to have been named in the underlying wrongful death action, and because it was Potter who

13  made the decision not to sue Allied Security, Potter is "actively" at fault whereas the McMillen Firm is,

14  at most, "passively" at fault and, under Nevada law, Potter is precluded from obtaining equitable

15  indemnity against the McMillen Firm.

16    Likewise, with respect to Potter's contribution claim against the McMillen Firm, this

17  claim suffers from the same fatal defect.  Indeed, because the sole basis for Plaintiffs' present

18  malpractice action stems from the purported failure to name Allied Security in the underlying wrongful

19  death lawsuit, and because **Potter admits that he alone** made the decision not to name Allied Security

20  as a defendant, Potter is precluded from obtaining contribution from the McMillen Firm under Nevada

21  law.  Indeed, in order for a contribution claim to exist, there must be some "negligence" on the party

22  against whom contribution is being sought.  In other words, there must be "joint tortfeasors."  Here, the

23  undisputed facts rule out this possibility; therefore, the McMillen Firm is entitled to summary judgment

24  on that claim as well and, as an end result, should be dismissed from the case.

25    Finally, the McMillen Firm also seeks summary judgment on all of the Plaintiffs' claims

26  (even though they are sought against Potter only).  The basis for summary judgment stems from the

27  undisputed fact that the Plaintiffs settled the underlying wrongful death action for $1.5 million.  In other

28

1 | words, even if it were malpractice for Allied Security not to have been named as a defendant in the
2 | underlying wrongful death case, Plaintiffs cannot establish that the purported failure to name Allied
3 | Security caused the Plaintiffs any damages.  As set forth below, the undisputed and uncontroverted
4 | testimony of McMillen's expert, Kent Robison, Esq., establishes that payment of $1.5 million to settle
5 | the underlying wrongful death case, which was paid by the defendants' excess carrier, and which was
6 | made even though Allied Security was not a party, eliminates the requisite legal malpractice elements of
7 | causation and damages.  Therefore, Plaintiffs' complaint should be dismissed under Nevada law.

8 | These joint motions are made and based upon the pleadings and papers on file herein, the
9 | following Memorandum of Points and Authorities, and any oral argument this Court may entertain at the
10 | time of the hearing.

11 | DATED this _____ day of October, 2007.

12 | HALL JAFFE & CLAYTON, LLP

14 | By: _____
15 | RILEY A. CLAYTON
| Nevada Bar No. 5260
| CHRISTOPHER L. BENNER
16 | Nevada Bar No. 8963
| 7455 W. Washington Avenue, Suite 460
17 | Las Vegas, Nevada 89128
| Attorneys for Defendants

19 | *MEMORANDUM OF POINTS AND AUTHORITIES*

20 | **I.**        **FACTUAL AND PROCEDURAL BACKGROUND[1]**

21 | This legal malpractice claim stems from the handling of a negligent security/wrongful
22 | death lawsuit that was filed in Clark County District Court back in 1999.  By way of background, Ernest
23 | Salvati, Jr. and his wife, Beatrice Marie Salvati, and their two friends took a trip from Pennsylvania to
24 | Las Vegas, Nevada.  While in Las Vegas, the group stayed as guests at a timeshare property owned by
25 | Preferred Equities Corporation and MEGO Financial Corporation doing business as Ramada Vacation

---

27 | [1] The factual representations asserted in Section I are undisputed and are only relevant so far as they provide the
28 | necessary background to enable the Court to understand how the underlying litigation and present legal malpractice litigation
| came into existence.

1  Suites (referred to as "PEC").

2         On September 5, 1997, in the very early morning hours, the group was walking back from
3  a nearby hotel/casino, the Maxim, located on Flamingo Road near Koval Lane, to their room at PEC,
4  which was located a few blocks from the Maxim. Unfortunately, when the group was in front of the
5  PEC property on the public sidewalk, two unknown assailants approached the group and one of the
6  assailants attempted to take a "fanny pack" from one ladies in the group. Things took a dramatic and
7  serious turn for the worse when the other assailant took out a gun and shot Ernest Salvati, Jr. in the
8  chest, leaving him dying in the street. Ernest, unfortunately, passed away.

9         The Salvati survivors, the Plaintiffs herein, contacted a law firm in their Pennsylvania
10  hometown, the McMillen Firm, to assist them with a potential negligent security/wrongful death lawsuit
11  against persons potentially responsible for Ernest Salvati's death. In connection therewith, the McMillen
12  Firm contacted Potter to serve as local Nevada counsel to file and prosecute the wrongful death claim.
13  According to the agreement between Potter and the McMillen Firm, Potter would be responsible for
14  handling the "liability" aspects of the claim, whereas the McMillen Firm would handle the "damages"
15  aspects of the claim. (See Letter dated March 23, 1998, attached as Exhibit "A"). Under this
16  arrangement, Potter would be entitled to receive 2/3 of any potential recovery whereas the McMillen
17  Firm would be entitled to receive 1/3 of any potential recovery. (Exhibit "A").

18         It is important to note that no attorney in the McMillen Firm was licensed to practice law
19  in Nevada, nor did anyone from the McMillen Firm ever associate-in as counsel of record under Nevada
20  Supreme Court Rule 42, which governs those attorneys who are licensed in other jurisdictions and who
21  desire to practice in Nevada on a limited/*pro hac vice* basis. The attorneys from the McMillen Firm are,
22  instead, licensed in Pennsylvania and other states.

23         In 1999, Potter filed a negligent security/wrongful death lawsuit on behalf of the Estate of
24  Ernest Salvati, Jr., and his surviving wife and children, Beatrice Marie Salvati, Greg Salvati, and Lisa
25  Mannion (hereinafter the "Salvatis," or the "Plaintiffs") in Clark County, Nevada, District Court. As
26  discussed in greater detail below, the only defendants named in the underlying suit were PEC and Mego
27  Financial Corporation (jointly referred to as "PEC") - the owners of the subject property that abutted the

28

1 | sidewalk and street where the murder occurred. Although PEC had hired an independent security firm,
2 | Allied Security, to provide security services at the PEC property, and Allied Security was providing
3 | security on the premises on the morning in question, Allied Security was not named as a defendant in the
4 | underlying negligent security/wrongful death lawsuit.

5 |       Over the next four years, the case proceeded through various stages of litigation, which
6 | included written discovery, depositions of multiple fact witnesses, retention and depositions of liability
7 | and damages experts, and settlement efforts, including a mediation. The case became more complicated,
8 | however, when the primary insurer for PEC went into receivership and liquidation, thus frustrating
9 | settlement efforts and, to some extent, delaying the case. Moreover, PEC began to experience financial
10 | difficulties of its own, which ultimately prompted it to file bankruptcy. However, before PEC filed for
11 | bankruptcy, PEC found itself without legal counsel, which prompted the trial court judge, Lee Gates, to
12 | enter a default against the named defendants. Potter's office subsequently successfully petitioned the
13 | bankruptcy court to lift the automatic stay so that the Salvatis could move forward with their negligent
14 | security/wrongful death lawsuit and prove up and potentially collect a judgment to the extent of any
15 | available insurance proceeds.

16 |       The Salvatis ultimately became dissatisfied with Potter's efforts and fired him as their
17 | attorney of record. Shortly thereafter, the Salvatis retained a new Nevada lawyer, Albert D. Massi
18 | ("Massi"), to further prosecute the case. In the meantime, PEC's excess carrier, Chubb Insurance or its
19 | subsidiary, Federal Insurance Company (referred to as "Chubb Insurance"), retained counsel to defend
20 | PEC. After conducting a contested "prove-up" hearing, which included live testimony and submission
21 | of expert damages reports, Judge Gates ultimately entered an award in favor of the Salvatis and against
22 | PEC in the following amounts:

| | |
|---|---|
| Beatrice Marie Salvati: | $1,626,000 |
| Greg Salvati (son) | $125,000 |
| Lisa Mannion (daughter) | $125,000 |
| Jewelene Nelson (estate rep.) | $125,000 |

27 |       PEC subsequently filed a timely appeal of the judgment entered against it. While the case

1    was on appeal, the claims against the named defendants were settled. Specifically, Chubb Insurance

2    agreed to pay the Salvatis $1.5 million in settlement of all claims against PEC, although the Salvatis

3    retained the right to pursue any potential legal malpractice claim against Potter. (Settlement Agreement,

4    attached as Exhibit "B").

5           Believing that the failure to name Allied Security as a defendant in the underlying

6    negligent security/wrongful death case effectively (allegedly) precluded the Plaintiffs from recovering

7    the full value of their judgment, the Plaintiffs filed the present legal malpractice action against Potter.

8    (Complaint for Legal Malpractice, attached as Exhibit "C").   Importantly, the Plaintiffs did not sue the

9    McMillen Firm for malpractice, however.  (Exhibit "C").

10          Following Potter's answer to the legal malpractice action, Potter filed a third party

11   complaint (later amended) against the McMillen Firm and Massi for indemnity and contribution.  (First

12   Amended Third Party Complaint, attached as Exhibit "D").  Massi has subsequently been dismissed

13   from the suit.

14   **II.         CONCISE STATEMENT OF UNDISPUTED FACTS**

15          The material and undisputed facts relating to the outcome of the motions for summary

16   judgment are as follows:

17          The Salvatis contacted the McMillen Firm regarding a potential negligent security/

18   wrongful death action stemming from the incidents of September 15, 1997, who later placed them in

19   contact with the Potter to pursue such an action in Nevada.  (Exhibit "A").  Potter filed a complaint in

20   the District Court of Clark County on March 22, 1999, against Preferred Equities Corporation, doing

21   business as Ramada Vacation Suites, and MEGO Financial corporation (Exhibit "C" ¶ 10).

22          Allied Security was not named as a defendant, nor served with process, during the

23   pendency of the underlying negligent security/wrongful death action. (Exhibit "C" ¶ 11,19, 20).

24   Specifically, the Salvatis allege that Allied Security was also at fault for the death of Ernest Salvati, Jr.,

25   and should have been named as a party defendant (Exhibit "C"¶ 11 ).  **Importantly, the purported**

26   **failure to name Allied Security as a defendant in the underlying negligent secuirty/wrongful death**

27   **action within the applicable statute of limitations period serves as the Salvatis' sole basis for**

28

1  **malpractice against Potter.** (Exhibit "C"). Specifically, the Malpractice Complaint states:

2           19.   By the failure of Defendant Potter, and acting as agent of Corporate Defendant
                  [Cal J. Potter, III, Esq. Chtd. dba Potter Law Office], to sue Allied Security
3                 within the applicable statute of limitations, Plaintiffs suffered damages in the
                  approximate amount of $1,500,000.00.
4
           20.   The failure of Defendant Potter, and acting as agent of Corporate Defendant, to
5                 sue Allied Security constituted a negligent breach of the applicable standard of
                  care owed by Defendants to Plaintiffs and also constituted a breach of the written
6                 contract between the parties.

7  (Exhibit "C")(portion in brackets [ ] added for clarification). The Malpractice Complaint then goes on to

8  lodge sixteen separate causes of action, each with the sole and specific allegation of malpractice being

9  Potter's purported failure to name and sue Allied Security, and that the failure to do so Allied was the

10  sole cause of damages allegedly suffered by the Plaintiffs herein. (Exhibit "C", ¶¶ 22, 24, 26, 28, 30, 32,

11  34, 36, 38, 40, 42, 44, 46, 48, 50, 52,).

12          In response to the Malpractice Complaint, Potter filed a First Amended Third Party

13  complaint on March 1, 2006, alleging that the McMillen Firm made the decision regarding which parties

14  to sue. (First Amended Third Party Complaint, attached as Exhibit "D"). For instance, Potter alleges:

15          11.   To the extent defendant(s) are liable to Plaintiffs on a theory of malpractice for
                  failure to sue Allied Security, so too are third party defendants if not more so for
16                their failure to mitigate damages and for malpractice in their own right. . . Third
                  party defendants ALBERT D. MASSI and ALBERT D. MASSI, Ltd.,
17                prosecuted the action, presumably under the guidance of MICHAEL B. JONES
                  and MCMILLEN, URICK, TOCCI & FOUSE until its conclusion. **Neither set**
18                **of counsel sued Allied Security for reasons to be disclosed during discovery.**

19  (Exhibit "D")(emphasis added).

20          Importantly, discovery has revealed exactly why Allied Security was not sued in the

21  underlying negligent security/wrongful death case, and that it was Potter, himself, who elected not to

22  name or sue Allied Security. Specifically, upon reviewing a copy of the proposed complaint in the

23  underlying matter, the McMillen Firm approved the filing of the lawsuit under the assumption that Potter

24  had named all the correct potential defendants. For instance, in a letter dated January 28, 1999, Jones, in

25  a letter to Potter, states:

26          I have reviewed the rough draft of the Complaint which you faxed to me on January 28,
            1999. First, I assume that Jewelene Nelson [the named representative of the estate] is
27          someone you are familiar with and that it is necessary to have a resident serve as Special
            Administratrix. **Second, I assume that these are the correct Defendants which you**

28

1     **have identified.** . . .

2   (Letter dated January 28, 1999, attached as Exhibit "E")(emphasis and portion in brackets [ ] added).

3   Indeed, noting that Potter had the responsibility for handling the "liability" aspects of the underlying

4   case, Potter was the one who was to identify and name the proper defendants. (Exhibit "A"). Of course,

5   the underlying complaint never included Allied Security as a named defendant. (Exhibit "C").

6        More importantly, discovery has revealed that Potter, and Potter alone, made the strategic

7   and conscientious decision not to name Allied Security as a defendant in the underlying negligent

8   security/wrongful death case. Consider these critical admissions from Potter's own deposition

9   testimony:

10       Q:   I understand what you're saying from a legal perspective that security is a non-delegable duty. But
11           once an entity assumes responsibility for security, either by actions or contract, does not that entity
          become potentially liable for a lapse in security?

12       Mr. Thuesen: Leading. Assumes facts. This witness hasn't been provided as an expert witness.

13       A:   Could.

14       Q:   You said they could?

15       A:   Could.

16       Q:   If that could be the case, wouldn't it be prudent to sue whatever entity was supposedly providing
          security at the moment that the lapse occurred?
17
      Mr. Thuesen: Form. Leading. Lacks foundation.
18
19       A:   In this instance, Preferred Equity is providing the security, and that was my position in the case.
          They provided the security.

20       Q:   But were they not providing security through an independent contractor?

21       Mr. Thuesen: Same objections.

22       A:   Correct.

23       Q:   **Was there a clear and conscious reason before the statute of limitations ran why the**
          **independent contractor that was providing security was not sued?**
24
      A:   **Yes.**
25
      Q:   **Could you tell us what it was?**
26
      A:   **The individuals that were providing the security, Preferred Equity, were the party that had**
27           **the legal responsibility in providing the security to the Salvatis.**

28

1        Mr. Clayton: Could you read back his answer, which was read back.

2    A:    **And one of the policies that we've had is not to put additional forces against this case.  I**
     **mean, to hire or bring in the individuals that be separate with experts and everything else in**
3    **the case.**

4    Q:    **Whose policy was that?**

5    A:    **That's been my policy on most premises liability cases.**

6    * * *

7    Q:    Well, you just testified that there was no reason why Allied could not be brought in before
          September 15, 1999.
8
     A:    **Correct. Tactical decision.**
9
     * * *
10
     Q:    There was no impediment whatsoever, no lack of knowledge, no lack of ability to sue them that
11        prevented you for suing Allied Security prior to the running of the statute of limitations on
          September 15, 1999?
12
     A:    **No.**
13
     * * *
14
     Q:    You mentioned that it was **your** policy, practice and routine to not include contracted for security
15        companies as named defendants; isn't that your earlier testimony?

16   A:    **Yes**.

17   Q:    You also testified earlier today that it was **your** conscientious decision not to bring in Allied into
          this case; isn't that true, sir?
18
     A:    **Yes**.
19
(Depo. Cal Potter, pp. 64-68, 72, 99, attached as Exhibit "F")(emphasis added).
20
          Potter was then asked what involvement, if any, the McMillen Firm had with respect to
21
the decision not to name Allied Security.  Again, consider Potter's critical admissions:
22
     Q:    Can you please tell me, then, how my client exercised any legal or material control over you
23        regarding **your** decision not to bring in Allied in this case?

24   Mr. Thuesen.  Lacks foundation.

25   A:    **They didn't object to it.  The didn't objection to the decisions.  They were put on notice of**
          **what the decisions were and they didn't object to it.**
26
(Exhibit "F", p. 99).
27
          Potter was then asked when he first brought up the subject of Allied Security not being
28

named in the underlying case and, as it turns out, this issue was not raised by Potter until about October 17, 2002, which is one month shy of three years **after** the running of the statute of limitations. Consider Potter's unequivocal testimony.

> Q:   **Had you ever brought up the topic of the independent contractor being Allied Security to Michael Jones or anybody from the McMillen Urich firm prior to the mediation with Joe Bongiovi?**
>
> A:   **No. It didn't become an issue until that time** [October 17, 2002]. The mediation.
>
> Q:   Then what made it become an issue at the mediation? Why did Allied all of a sudden become the topic of discussion?
>
> A:   Because Michele Schwarz [counsel for PEC] was there trying to say that she was going to go bankrupt for PEC.

(Exhibit "F", p. 266)(emphasis and information in brackets [ ] added). In other words, it is not until the mediation that Potter learned that PEC was, itself, experiencing financial difficulty, and that Potter then raised that issue to the McMillen Firm – even though Potter knew who Allied Security was and could have brought them into the suit before the applicable statute of limitations period ran. (Exhibit "F", pp. 266, 72).

Finally, as mentioned above, the underlying negligent security/wrongful death litigation resolved via settlement, after the default judgment obtained by the Salvatis was appealed. Specifically, the Salvatis were paid $1.5 million by Chubb Insurance in exchange for a release and dismissal of all claims against the named defendants. (Exhibit "B"). The McMillen Firm's position is that payment of the $1.5 million legally eliminated any potential of malpractice "damages" being caused by Potter's purported failure in not naming Allied Security as a defendant. In furtherance of this position, the McMillen Firm **obtained the only expert to testify regarding two required components of a legal malpractice claim – components the Plaintiffs herein overlook, i.e., "causation and damages."** Specifically, the McMillen Firm has retained one of Nevada's finest, most respected, and successful plaintiff's trial lawyers, Kent Robison, Esq., of Robison Belaustegui, Sharp & Low, to offer an expert opinion on the legal malpractice issues raised in this case. After reviewing thousands of pages of documents and testimony generated in the underlying case and the legal malpractice case, Mr. Robison provides the following **unrefuted** expert opinion:

... One of the elements of a legal malpractice claim requires that the Plaintiffs (the Salvatis) sustained damages as a result of the lawyer's misfeasance or malfeasance. That element is not established in this case since the Plaintiffs received a fair and reasonable settlement of $1,500,000, which represents a reasonable value of their claims against the tortfeasors in the underlying action.

* * *

S.   That $1,500,000 settlement represents a reasonable value of the case considered in light of all complicating circumstances.

Basis And Reasons

1.   Possibility of a defense verdict [no duty to protect against incidents on the public sidewalk or street].

2.   Possibility of no coverage [by Chubb Insurance, the excess carrier].

3.   Delay, stress and uncertainty of future litigation.

4.   The $1,700,000 initial demand by Potter was a reasonable "opening" demand for settlement.

5.   The mediator's $1,000,000 estimate [on the settlement value of the case] is probative.

6.   Based on information Jones received from Mr. Potter, Mr. Jones' $1,300,000 suggestion [of a settlement counter offer] is also appropriate.

(Expert Report of K. Robison, pp. 2-3, 22-23). Irrespective of the fact that Allied Security was not named as a defendant in the underlying lawsuit, the Plaintiffs were still reasonably and fairly compensated through settlement of their claim. Moreover, these proceeds came from the excess insurance carrier for the defendants named in the case, meaning that PEC was sufficiently covered to indemnify against any verdict. The settlement also into account the fact that there was a reasonable likelihood that a defense verdict would have been reached since even the non-named defendant, Allied Security, had no legal duty to patrol public sidewalks or streets. Likewise, the settlement reflected the fact the Salvatis themselves would start from "square one" if the default judgment were overturned on appeal.[2] Finally, the settlement accounts for the fact that earlier settlement offers from the Plaintiffs fell squarely within the $1.5 million range, coupled with the fact that the mediator, Joe Bogiovi, placed a settlement value on the case at $1 million. Indeed, all of these factor, according to the only expert to

---

[2] Kent Robison, Esq., and every other Nevada lawyer who has been deposed on the subject in this case has testified that Judge Gates decision to grant a default, coupled with other flaws in the judgment itself, would more likely have resulted in the judgment being overturned by the Nevada Supreme Court on appeal. (Exhibit "G", pp. 21-23).

1    testify on these issues, establish that the Salvatis obtained a reasonable settlement for their case and

2    could not, as a matter of law, sustained "damages" as a result fo the purported failure by Potter not to

3    have named Allied Security in the underlying litigation. (Exhibit "G").

**III.      LEGAL ARGUMENT**

        **A.      Standard For Summary Judgment**

6            A moving party is entitled to summary judgment when there are no genuine issues of

7    material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56 (c).  A

8    material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the

9    differing versions of the truth. *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The

10   substantive law defines which facts are fundamental. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

11   248 (1986).  A genuine issue of material fact is more than some "metaphysical doubt" as to the material

12   facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the factual

13   context makes the non-moving party's claims implausible, that party must come forward with more

14   persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial.

15   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

        **B.      The McMillen Firm Did Not Participate In And Had No Involvement Whatsoever In The Decision To Name Allied Security; Therefore, Any Claim For Indemnity Or Contribution Against The McMillen Firm Based Upon A Purported Failure To Name Allied Security Must Fail As Matter Of Law.**

19           As established herein, the sole basis for malpractice against Potter is the purported failure

20   in not naming Allied Security as a defendant in the underlying negligent security/wrongful death

21   litigation. (Exhibit "C").  Potter, however, seeks equitable indemnity against the McMillen Firm for any

22   damages allegedly sustained by the Salvatis stemming from that decision – even though the McMillen

23   Firm had no involvement whatsoever in the decision not to name Allied Security as a defendant.  In light

24   of Potter's "active" involvement and the McMillen Firm's "passive" (actually non-existent) involvement

25   in deciding not to name Allied Security, Potter is legally precluded from obtaining equitable indemnity

26   against the McMillen Firm, and summary judgment should be entered in McMillen's favor on that claim.

27           Under well-established Nevada law, when one party is subject to liability, which, as

28

Page 12 of 22

between that party and another, the other should bear, the first party is entitled to full indemnity – an "all or nothing" concept. *Black & Decker Inc. v. Essex Group, Inc.* 105 Nev. 344, 345, 775 P.2d 698, 699 (1989). Indeed, "[t]he right of indemnity rests upon a difference between the primary [active] and the secondary [passive] liability of two persons, each of whom is made responsible in law to an injured party."[3] *Id.* Importantly, evidence of only "passive negligence" is insufficient to establish the requisite "active wrongdoing" by the party seeking indemnity and, under such a situation, equitable indemnity is unavailable. *Id.* Moreover, the Nevada Supreme Court has recently stated that for one to recover equitable indemnity from another, the latter must be "primarily liable" for the injuries sustained by the plaintiff. *The Doctors Co. v. Vincent,* 120 Nev. 644, 654, 98 P.3d 681, 688 (2004).

In the case at bar, the undisputed facts establish that the McMillen Firm is not "actively" or "primarily" liable to the Salvatis for any potential damages stemming from the failure to name Allied Security in the underlying case. Here, **Potter admits** that he personally made a tactical decision in not naming Allied Security, which is consistent with his general practice and routine in negligent security cases. (Exhibit "F", pp. 65-68, 72, 99). **Potter also admits** that he did not make the McMillen Firm even aware of any potential basis to bring Allied Security into the litigation until a mediation in October, 2002, nearly three years after the applicable statute of limitations had ran. (Exhibit "F", p. 265). The McMillen Firm's involvement in naming defendants, if it can be called that, is limited to: (1) reviewing a copy of the proposed complaint (which **did not** include Allied Security as a named defendant); and (2) the McMillen Firm sending Potter a letter dated January 28, 1999, after reviewing the proposed complaint, which stated: "**I assume that these are the correct defendants that you have identified**." (Exhibit "E")(emphasis added).

Respectfully, the undisputed facts of this case establish that Potter was the sole person involved in making the decision not to name Allied Security as a defendant. Thus, Potter's attempt to foist equitable indemnity for any potential damages regarding that decision upon a party who had no

---

[3] Notably, the Salvatis did not sue the McMillen Firm for malpractice, and the court-ordered date for naming parties and amending pleadings has long since passed. Thus, the McMillen Firm cannot, as a matter of law, ever become "responsible" to the Salvatis for their involvement in the handling of the underlying negligent security/wrongful death lawsuit. This fact alone should eliminate the potential for Potter to seek equitable indemnity. *Id.*

1   involvement with that decision should be readily rejected given clear Nevada law. Therefore, the

2   McMillen Firm respectfully requests that summary judgment be entered in its favor on Potter's equitable

3   indemnity claim.

4          The same facts and analysis likewise preclude any potential for Potter to obtain

5   contribution from the McMillen Firm. Under Nevada law, the right of contribution is statutorily based.

6   *See, e.g.,* NRS 17.225. In general terms, contribution may be available where:

7                ... two or more persons become jointly or severally liable in tort for the same injury to
                person or property or for the same wrongful death, there is a right of contribution among
8                them even though judgment has not been recovered against all or any of them.

9   According to the foregoing statute, a party may obtain contribution if two or more persons become

10   jointly or severally liable in tort for the same injury to a third party. *Id.* In the present case, however, the

11   undisputed facts establish that Potter, and Potter alone, made the sole decision not to name Allied

12   Security as a defendant in the underlying negligent security/wrongful death litigation. Respectfully,

13   there is no reasonable likelihood that a jury, based upon Potter's own admissions, would conclude that

14   the McMillen Firm was somehow responsible for determining whether to name Allied Security. Rather,

15   the evidence in this case is such that a reasonable jury could not return a verdict for Potter on this issue.

16   *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, any damages stemming from that

17   decision should be his and his alone. Because, under Nevada law, Potter is not entitled to contribution,

18   this Court should grant summary judgment in the McMillen Firm's favor on this claim as well.

19          **D.     Because McMillen Is Not A "Joint Tortfeasor," Potter Cannot Seek
                    Indemnity From The McMillen Firm.**

20

21          Apart from the fact that there is no evidence to suggest that the McMillen Firm was

22   involved in the decision to not name Allied Security, which serves as its own basis for granting summary

23   judgment in the McMillen Firm's favor on the contribution claim, there is also one critical **legal** reason

24   why Potter's contribution claim cannot exist in this case either. This argument stems from the fact that

25   the McMillen Firm, as the case is postured, can never be deemed a "joint tortfeasor" under Nevada law

26   to enable Potter to obtain contribution. *See,* NRS 17.225.

27          In the present case, the Salvatis have sued Potter and Potter only for malpractice. There is

28

no claim for malpractice against the McMillen Firm, and the Court may take judicial notice of the fact that the date for naming additional parties and/or amending pleadings has long since passed. Thus, when the jury decides whether it was malpractice to have not named Allied Security as a defendant in the underlying case, there will only be a single defendant on the jury verdict form – Potter. In other words, because there is no legal possibility that the McMillen Firm could ever be potentially assigned any fault vis-a-vis the Salvatis for the decision not to have named Allied Security, the McMillen Firm cannot "become jointly or severally liable in tort for the same injury to person or property" under NRS 17.225, which is required in order for the right of contribution to exist.

In fact, Potter's attempt to assert a contribution claim against the McMillen Firm in the present case seems contrary to well-established Nevada law in a related context. As detailed below, the factual and procedural parallels of this case seem consistent with the Nevada Supreme Court's the instant case with *Reid v. Royal Insurance Co.,* 80 Nev. 137, 390 P.2d 45 (1964) cited with approval in *The Doctors Co. v. Vincent,* 120 Nev. 644, 654, 98 P.3d 681, 688 (2004); therefore, the holding in *Reid* should apply to the McMillen Firm in this case.

In *Reid,* a home owner plaintiff brought suit against a general contractor for negligent work, which caused the plaintiff's home to flood. Just as Potter brought McMillen into the instant case via third party complaint, the general contractor defendant in *Reid* brought a third party complaint against its subcontractor, claiming that the subcontractor had been negligent and was the party responsible for the homeowner's damages. **Importantly, because the homeowner never brought suit against the subcontractor, the subcontractor remained a third party defendant only, and not a defendant**. At trial, the court allowed the jury to assess fault against both the general contractor defendant and the subcontractor defendant, and entered judgment for the homeowner against both the general contractor *and* the third-party defendant subcontractor. On appeal, the subcontractor argued that the judgment against it could not stand because it was never named as a defendant in the plaintiff's suit.

In deciding *Reid*, the Nevada Supreme Court held that if a new party is impleaded into a case via a third-party complaint, **the plaintiff has the option to accept, or not to accept, the third party defendant as a defendant in the plaintiff's case.** *Reid,* 80 Nev. at 47, 390 P.2d at 141. As the

1   *Reid* court stated, "the plaintiff has the right to decide for himself whom he shall sue." Thus, because

2   the homeowner plaintiff never directly sued the subcontractor, the Nevada Supreme Court held that the

3   judgment for the homeowner against the subcontractor holding it liable to the homeowner could not

4   stand. The court reasoned:

5               **The plaintiffs never sought to impose a liability upon the subcontractor. Even after**
              **the subcontractor was impleaded by the named defendant (general contractor) the**
6               **plaintiffs did not choose to amend their complaint to accept the subcontractor as an**
              **additional defendant in their case.** We can only conclude that they were satisfied with
7               the validity of their case against the general contractor and were willing to win or lose on
              that claim for relief. [Emphasis added].

8

9   *Id.*

10          In light of the holding in *Reid,* because the Salvatis have elected not to sue the McMillen

11  Firm and have not amend their complaint to accept the McMillen as an additional defendant, there

12  cannot be a finding of "joint or several liability", which is required under NRS 17.225. *Id.* Again,

13  because Potter is the only named defendant in the Salvati's case, the verdict form in the Salvati's case

14  against Potter can only be drafted in two ways: "Potter is liable," or "Potter is not liable." The verdict

15  form, under *Reid*, can never say: "Potter and Jones are liable." Therefore, in the case at bar, there is no

16  factual or legal setting under which the McMillen Firm can ever be "jointly and severally liable" for

17  purposes of asserting a contribution claim because the Salvatis have not sued the McMillen Firm.

18  Therefore, on this additional/separate basis, the McMillen Firm respectfully submits that summary

19  judgment should be entered in its favor, and the contribution claim should be dismissed.[4]

20          **E.      The Salvatis Cannot Prove They Sustained Any Damages As A Result Of**
                  **Potter's Purported Failure Not To Have Named Allied Security; Therefore,**
21                  **Because The Elements Of Causation And Damages Are Lacking, Summary**
                  **Judgment On The Plaintiffs' Complaint Should Be Granted.**

22

23          As identified above, the McMillen Firm has established the absence of evidence

24  regarding their involvement in the decision not to have named Allied Security. Yet, as the case presently

25  stands, the McMillen Firm is still a potentially viable third-party defendant and may potentially be called

26

27          [4] Moreover, because Potter has not yet extinguished any liability more than its proportionate share to the Plaintiffs,
    the contribution claim is premature and should be dismissed on that ground as well.

28

upon to respond to any damages sustained by the Salvatis in light of Potter's decision not to have named Allied. Thus, it is incumbent upon the McMillen Firm to defend against the Plaintiff's complaint in an effort to further eliminate any potential exposure to it. For this reason, the McMillen Firm submits that summary judgment on the Plaintiffs' complaint should be granted because, as a matter of law, the Plaintiffs cannot establish that the decision to not name Allied Security caused the Salvatis to sustain any damages.

A claim for legal malpractice requires proof of five elements: (1) an attorney-client relationship; (2) a duty owed to the client by the attorney to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity possess in performing the litigation; (3) a breach of this duty, (4) the breach being the proximate cause of damages; (5) actual loss or damage resulting from this breach. *Mainor v. Nault,* 120 Nev. 750, 774, 101 P.3d 308, 324 ( 2004). This motion for summary judgment focuses on the fourth and fifth elements, causation and damages, noting that the elimination of only one element of a claim is sufficient to defeat the entire claim via summary judgment. *See, e.g., Bartmettler v. Reno Air, Inc.* 114 Nev. 441, 447, 956 P.2d 1382, 1386 (1998)(holding that "where an essential element of a claim for relief is absent, the facts, disputed or otherwise, as to other elements are rendered immaterial and summary judgment is proper.")

Before specifically addressing the causation and damages issues, it is important to first understand the nature of the Plaintiffs malpractice claim against Potter. According to the complaint, the Salvatis' position is that because Allied Security was not named as a defendant in the underlying case, the Salvatis were somehow "short changed" on their ability to collect on a default judgment rendered against PEC (as opposed to Allied Security). (Exhibit "A"). By making this argument, however, the Salvatis ignore two critical, outcome determinative factors. First, Plaintiffs cannot escape the fact that **Chubb Insurance was solvent and had sufficient proceeds to pay for the award for the named defendant PEC**, i.e., a $20 million excess policy! Again, it is beyond dispute that Chubb Insurance actually paid $1.5 million to settle this case. Second, if Allied Security had been named in the underlying lawsuit, **Allied Security would have defended itself and there would not have been a default judgment taken in the first place!** Thus, under this second factor the Salvatis would have been

1  forced to litigate a case against a viable company (Allied Security) with its own viable insurance carrier.
2  In other words, there would have never been a $2 million default judgment entered in the first place had
3  Allied Security been named. Assuming that Allied Security would have participated in settlement
4  negotiations and had the same view of the case with the mediator and the other parties to the litigation,
5  e.g., a settlement value around $1 million dollars, then the case would have been resolved at that
6  mediation at or near that level if Allied Security had been a party. Thus, the fact that Plaintiffs
7  ultimately obtained a legally suspect default judgment for $2,001,000, in the underlying case was a
8  fortuitous windfall.

9         However, in this case Allied Security was not named as a defendant in the underlying
10  lawsuit. **Yet, despite Allied Security's absence, the underlying negligent security/wrongful death**
11  **case still ultimately settled for $1.5 million**. Thus, the true question presented in the legal malpractice
12  portion of the "case within the case" is whether that settlement reasonably and fairly compensated the
13  Salvatis for the value of their claim, regardless of whether Allied Security was in the suit. In answering
14  that specific question, the only legal malpractice expert retained by any party in this case is Kent
15  Robsion, Esq.[5] Mr. Robison has opined that the settlement was reasonable and fairly compensated the
16  Salvatis given all of the circumstances of the underlying case. (Exhibit "G", pp. 2-3, 21-23). Again, Mr.
17  Robison is widely regarded as one of Nevada's finest, most respected, and most successful plaintiff's
18  trial lawyers. After reviewing thousands of pages of documents and testimony generated in the
19  underlying case and the legal malpractice case, it is Mr. Robison **unrefuted** expert opinion that the
20  causation and damage elements of the Salvatis' legal malpractice claim are lacking. Consider again his
21  opinions:

22            . . . One of the elements of a legal malpractice claim requires that the Plaintiffs (the
              Salvatis) sustained damages as a result of the lawyer's misfeasance or malfeasance. That

---

[5] The Court should take judicial notice of the fact that the McMillen Firm filed a Motion to Exclude Expert Testimony on Legal Malpractice and Causation Issues on August 15, 2007. That motion has not been ruled upon yet, even though no party has opposed that motion. The purpose of that motion was to dovetail with the present motion for summary judgment. In other words, the McMillen Firm has sought to preclude any other party from producing a legal malpractice expert since the other parties did not timely identify such an expert consistent with prior court orders. Now, in the instant motion, the McMillen Firm is able to argue that there will be no other testimony on the issue of the "causation" and "damages" aspects of the legal malpractice claim, and because the Plaintiff has not produced a legal malpractice expert of his own to testify about these issues, their legal malpractice claim fails as a matter of law.

element is not established in this case since the Plaintiffs received a fair and reasonable settlement of $1,500,000, which represents a reasonable value of their claims against the tortfeasors in the underlying action.

* * *

S.   That $1,500,000 settlement represents a reasonable value of the case considered in light of all complicating circumstances.

Basis And Reasons

1.   Possibility of a defense verdict [no duty to protect against incidents on the public sidewalk or street].

2.   Possibility of no coverage [by Chubb Insurance, the excess carrier].

3.   Delay, stress and uncertainty of future litigation.

4.   The $1,700,000 initial demand by Potter was a reasonable "opening" demand for settlement.

5.   The mediator's $1,000,000 estimate [on the settlement value of the case] is probative.

6.   Based on information Jones received from Mr. Potter, Mr. Jones' $1,300,000 suggestion [of a settlement counter offer] is also appropriate.

(Expert Report of K. Robison, pp. 2-3, 22-23). Irrespective of the fact that Allied Security was not named as a defendant in the underlying lawsuit, the Plaintiffs were still fairly and reasonably compensated through settlement for the value of their claim. Again, this $1.5 million settlement accounted for the chance of a defense verdict in the underlying case, the likelihood of overturning the judgment on appeal, the fact that the Salvatis would have to start from square one if the appeal were successful, the fact that earlier settlement offers from the Plaintiffs fell squarely within the $1.5 million range; and the fact that the mediator, Joe Bogiovi, placed a settlement value on the case at $1 million. In other words, the undisputed expert testimony on this case establishes that the Salvatis obtained a reasonable and fair settlement for their case and could not, as a matter of law, have sustained any "damages" as a result fo the purported failure by Potter not to have named Allied Security in the underlying litigation. (Exhibit "G").

It is important to note that there will be no contrary testimony from any other legal malpractice expert, noting that neither the Salvatis nor Potter elected to retain such an expert and timely produce an expert report. Thus, the only expert testimony on the issue of whether the settlement was

1   reasonable and fairly compensated the Salvatis, which comes from Kent Robison, Esq., will be

2   unequivocal and unrefuted, and will lead only to one reasonable conclusion – that the Salvatis suffered

3   no damages from Allied Security being omitted from the underlying lawsuit. Again, because the

4   elements of causation and damage do not exist in this legal malpractice case, even assuming that it were

5   "negligent" for Potter not to have named Allied Security, summary judgment is proper. *See, e.g.,*

6   *Bartmettler v. Reno Air, Inc.* 114 Nev. 441, 447, 956 P.2d 1382, 1386 (1998)(holding that "where an

7   essential element of a claim for relief is absent, the facts, disputed or otherwise, as to other elements are

8   rendered immaterial and summary judgment is proper.")

9           Now, it is important to note that the Plaintiffs did not name a legal malpractice expert.

10  Instead, the Plaintiffs relied upon the fact that the issue of an attorney missing a statute of limitations is

11  something within the knowledge of lay jurors and, as such, a legal malpractice expert need not be

12  retained. Indeed, Plaintiffs' representation on that issue is consistent with Nevada law. *See Allyn v.*

13  *McDonald*, 112 Nev. 68, 72, 910 P.2d 263, 266 (1996). However, Plaintiff has omitted the fact that

14  expert testimony will be necessary to establish the additional elements of the legal malpractice claim,

15  i.e., causation and damages. In fact, the Nevada Supreme Court suggested that expert testimony would

16  be required to prove causation, although it did not specifically reach that issue in the *Allyn* case. The

17  court stated:

18              The elements for a claim of legal malpractice are the existence of "an attorney-client
                relationship, a duty owed to the client by the attorney, breach of that duty, and the breach
19              as proximate cause of the client's damages." *Semenza v. Nevada Med. Liab. Ins. Co.*, 104
                Nev. 667-68, 765 P.2d 184, 185 (1988). **We note that while an expert witness may be**
20              **required to prove the causation issue**, we need not reach that issue here. [Emphasis
                added].
21

22  Indeed, most courts hold that expert testimony **is required** in legal malpractice cases to establish

23  causation. *See e.g., Holder v. Gienapp,* 2007 WL 952039 (D. N.H. 2007)citing *Carbone v. Tierney*, 151

24  N.H. 521, 528 (2004); *F.W. Industries v. McKeehan*, 198 S.W.3d 217, 221 (Tex. App. 2005). Likewise,

25  the leading authors of the legal malpractice treatise, *Legal Malpractice 2006 Ed.* Vol. IV at p. 1109,

26  Ronald E. Mallen and Jeffrey M. Smith state: "Expert testimony may be essential to provide the nexus

27  between the error and damage." Thus, Nevada law, consistent with the law of other jurisdictions and

28

1 the leading authors who have addressed this issue, is that expert testimony is required to establish the

2 causal connection between Potter's purported error in not suing Allied Security, and any damages

3 sustained by them.  This rule of law becomes even more applicable when we recognize that the Salvatis

4 received a $1.5 million settlement.  For instance, can it reasonably be said that any jury in the District of

5 Nevada is sufficiently familiar with wrongful death verdicts and settlements, issues regarding the

6 likelihood of success on appeal and overturning a default judgment, the defensibility of a negligent

7 security/wrongful death case that occurred on a public street/sidewalk, and the other factors that weigh

8 heavily into a decision to settle a case such as the underlying case?  Of course not, and that is why expert

9 testimony on the causation and damages issues are required in this case.  Thus, in the absence of any

10 expert testimony, Plaintiffs, as a matter of law, simply cannot establish their legal malpractice claim, and

11 the underlying malpractice complaint should be dismissed through summary judgment.

12 **IV.       CONCLUSION**

13        Therefore, based on the foregoing reasons, the McMillen Firm respectfully submits that

14 summary judgment should be entered in its favor with respect to the claims asserted in the first amended

15 third party complaint, and that summary judgment should be entered against the Plaintiffs with respect to

16 their complaint.

17        DATED this _____ day of October, 2007.

18                                                       HALL JAFFE & CLAYTON, LLP

19                                              By: _____

20                                                       RILEY A. CLAYTON
                                                         Nevada Bar No. 5260
21                                                       CHRISTOPHER L. BENNER
                                                         Nevada Bar No. 8963
22                                                       7455 West Washington Avenue, Suite 460
                                                         Las Vegas, Nevada 89128
23                                                       Attorneys for Third-Party Defendants

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2        Pursuant to Rule 5(b) of the Federal Rules of Civil Procedure, I hereby certify under

3    penalty of perjury that I am an employee of HALL JAFFE & CLAYTON, LLP, and that on the 1st day

4    of October, 2007, the foregoing **THIRD PARTY DEFENDANTS' MOTION FOR SUMMARY**

5    **JUDGMENT ON THE THIRD PARTY COMPLAINT AND THIRD PARTY DEFENDANTS'**

6    **MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFFS' COMPLAINT**, was served

7    upon the parties by filing the same with the court's e-filing and service system, and by placing an

8    original or true copy thereof in a sealed envelope, and depositing it in the U.S. Mail, postage prepaid, at

9    Las Vegas, Nevada, addressed as follows:

10
James E. DePasquale
906 Grant Building
11
Pittsburgh, PA 15219
*Attorney for Plaintiffs*
12
Kristina S. Holman
13
4475 South Pecos Rd.
Las Vegas, Nevada 89121
14
*Attorney for Plaintiffs*
15
Steven Bartell, Esq.
JACKSON & WALLANCE, LLP
16
3753 Howard Hughes Pkwy, Ste 200
Las Vegas, NV 89107
17
*Attorney for Defendants / 3rd Party Plaintiffs*

18

19

20
An Employee of
HALL JAFFE & CLAYTON, LLP.
21

22

23

24

25

26

27

28