STEVEN R. BARTELL, ESQ.
Nevada State Bar No. 7271
JAKE D. KELSEY, ESQ.
Nevada State Bar No. 9076
JACKSON & WALLACE LLP
3753 Howard Hughes Pkwy, 200
Las Vega, Nevada 89169
Tel:    702.889.6363
Fax:    702.889.6362

Attorneys for Defendant/Third Party Plaintiff
Cal. J. Potter, III; Cal. J. Potter, III, Esq., Chtd. d/b/a
Potter Law Offices

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| BEATRICE MARIE SALVATI AS EXECUTRIX OF THE ESTATE OF ERNEST SALVATI, JR., DECEASED, AND IN HER OWN RIGHT; GREGORY SALVATI, AND LISA MARIE MANNION,<br><br>Plaintiffs,<br><br>v.<br><br>CAL J. POTTER, III; AND CAL J. POTTER, III, ESQ., CHTD. d/b/a POTTER LAW OFFICES, a Nevada corporation; DOES I through X, Inclusive; and ROE CORPORATIONS, I through X, Inclusive,<br><br>Defendants.<br><br>AND RELATED ACTIONS. | Case No.  CV-S-05-0811-RCJ-(LRL)<br><br>**OPPOSITION TO THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE THIRD PARTY COMPLAINT**<br><br>**AND**<br><br>**JOINDER IN THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S COMPLAINT.** |

Defendants/Third Party Plaintiffs Cal. J. Potter, III; Cal. J. Potter, III, Esq., Chtd. d/b/a Potter Law Offices (collectively referred to as "Cal Potter"), by and through their attorneys, JACKSON & WALLACE LLP, hereby submit this Opposition to Third Party Defendants' Motion for Summary Judgment on the Third Party Complaint and, also joins Third-Party

JACKSON & WALLACE LLP
LAS VEGAS, NEVADA

1441438v1

OPPOSITION AND JOINDER IN MOTIONS
FOR SUMMARY JUDGMENT
CV-S-05-0811-RCJ-(LRL)

Defendants in their Motion for Summary Judgment on the Plaintiffs' Complaint in the above-entitled action.

Cal Potter opposes summary judgment on the Third Party Complaint on the grounds that a genuine issue of material fact exists as to the involvement of the Third Party Defendants, Michael B. Jones and McMillen, Urick, Tocci & Fouse (collectively referred to as the "McMillen Firm"), in the alleged conduct giving rise to Plaintiffs' claim in the present action. Contrary to the McMillen Firm's assertions in their Motion for Summary Judgment, the McMillen Firm knew of and implicitly ratified Cal Potter's decision not to name Allied Security as a defendant in the underlying wrongful death action. The McMillen Firm demanded, assumed, and was solely responsible for advising the Plaintiffs regarding the underlying action, and had every opportunity throughout the underlying litigation to question the decision not to name Allied Security. Although they decry liability for the decision to forego naming Allied Security, it is undisputed that the Plaintiffs Salvati were solely advised on this action by the McMillen firm. As Plaintiffs' claims in the present action center on the purported failure to name Allied Security as a defendant in the underlying action, summary judgment on the Third Party Complaint alleging contribution and indemnity is inappropriate.

With respect to Plaintiffs' present Complaint, summary judgment is appropriate insofar as Plaintiffs cannot establish that the purported failure to name Allied Security caused Plaintiffs any actual harm. Any liability for security by Allied was pursuant to a contract, in which Allied agreed to provide uniformed, unarmed security officer, to protect the property (only) of Preferred Equities Corporation. The undisputed expert testimony (and testimony of all participants in the underlying action) establishes that Plaintiffs obtained a generous settlement from the underlying defendants' excess carrier in an amount that reasonably represents the value of the Plaintiffs' claims in the underlying case. In addition, the decision not to name Allied Security as a defendant in the underlying case was a sound tactical decision that was reasonable in light of the facts and circumstances which existed at the time the decision was made. Therefore, Plaintiffs will be unable to prove at least two of the necessary elements of their legal malpractice claim in the present lawsuit. Had Allied been named, Plaintiffs would have been required to try the

JACKSON & WALLACE LLP
LAS VEGAS, NEVADA

1441438v1

2

OPPOSITION AND JOINDER IN MOTIONS
FOR SUMMARY JUDGMENT
CV-S-05-0811-RCJ-(LRL)

underlying case on its merits, rather than proceeding with a default prove-up for damages. Accordingly, summary judgment on the Plaintiffs' Complaint is appropriate.

This Partial Opposition and Joinder are made and based on the pleadings and papers on file herein, the attached Memorandum of Points and Authorities, and any oral argument the Court may allow.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts of this case relate to an earlier case filed by the Salvati Plaintiffs as a result of a deadly assault that occurred in Las Vegas, Nevada on September 5, 1997. Early that morning, a group of individuals, including Ernest Salvati, Jr., were walking on the sidewalk in front of the hotel at which they were staying, when two assailants approached them and shot and killed Mr. Salvati. The Plaintiffs, who were from Pennsylvania, eventually contacted the McMillen Firm to assist them in pursuing negligence and wrongful death claims against the hotel owners. The McMillen Firm's attorneys, none of whom are licensed to practice in Nevada, contacted Cal Potter to assist them in pursuing the Salvatis' claims. In 1999, on behalf of the Salvatis, and in coordination with the McMillen Firm, Cal Potter filed a negligent security/ wrongful death lawsuit against the hotel owner, Preferred Equities Corporation and MEGO Financial Corporation doing business as Ramada Vacation Suites (collectively referred to as "PEC"). PEC's property security contractor, Allied Security, was not named as a defendant because it was PEC who bore the primary responsibility for providing security to the Salvatis. In addition, Allied Security was not named as a defendant based on the tactical consideration of not multiplying the defense against the Salvati's claims. Cal Potter knew that PEC had sufficient insurance coverage in place to cover the claims sought by the Salvatis, and there was no reason at the time to believe that the Salvatis might not be able to recover the entire value of their claims arising out of the September 5, 1997 incident.

As part of the agreement between the McMillen Firm and Cal Potter, Cal Potter was not to contact the Salvati's directly regarding the case. Rather, the McMillen firm was tasked with the

JACKSON & WALLACE LLP
LAS VEGAS, NEVADA

1441438v1

3

OPPOSITION AND JOINDER IN MOTIONS
FOR SUMMARY JUDGMENT
CV-S-05-0811-RCJ-LRL

1  responsibility of directly advising the Salvatis on all aspects of the case. <u>Any communication
2  between Cal Potter and the Salvati's was to go through the McMillen Firm</u>. For the next four
3  years, the parties conducted extensive discovery, including numerous depositions of fact and
4  expert witnesses. The parties also conducted extensive settlement negotiations, and they
5  participated in mediation. Throughout this time, Cal Potter communicated only indirectly with
6  the Salvatis, as the McMillen Firm continued to advise the Salvatis directly regarding all aspects
7  of the case.

8  Eventually, after over four years of litigation, PEC's primary insurer went into
9  receivership and liquidation, and PEC itself filed for bankruptcy. Cal Potter was able to persuade
10 the bankruptcy court to lift its automatic stay so that the Salvatis' case against PEC could go
11 forward. Cal Potter was also able to obtain a default against PEC in favor of the Salvatis.

12 The Salvatis subsequently hired a different Nevada attorney to continue to prosecute their
13 claims. PEC's excess carrier retained counsel to defend PEC's interests, and when the underlying
14 court refused to set aside the default, a hearing was held to determine the amount of damages to
15 be awarded to the Salvati Plaintiffs' as a result of the default. Following a contested hearing, the
16 Plaintiffs in the underlying case were awarded a total of $2,001,000. PEC appealed the default
17 judgment; and, while the appeal was pending, a settlement of $1,500,000 was reached between
18 the parties.

19 The Salvatis claim that they were unable to recover the full amount of their default
20 judgment because of the failure to name Allied Security as a defendant in the underlying
21 wrongful death/negligent security case. Accordingly, they filed the present lawsuit against Cal
22 Potter, alleging legal malpractice. Cal Potter then filed a Third Party Complaint against the
23 McMillen Firm for indemnity and contribution.

## II.

## ARGUMENT AND AUTHORITY

**A.   SUMMARY JUDGMENT ON THE THIRD PARTY COMPLAINT**

27 The Federal Rules of Civil Procedures provide that a party is entitled to summary
28 judgment when there is no genuine issue of material fact, and the party is entitled to judgment as

JACKSON & WALLACE LLP
LAS VEGAS, NEVADA
1441438v1
4
OPPOSITION AND JOINDER IN MOTIONS
FOR SUMMARY JUDGMENT
CV-S-05-0811-RCJ-(LRL)

a matter of law. Fed. R.Civ.P. 56(c). A material fact is one which affects the outcome of the litigation and the truth of which must be determined by trial. See *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-1306 (9th Cir. 1982).

The question of whether Cal Potter is entitled to indemnity and/or contribution from the McMillen Firm in the present case turns on the relationship between Cal Potter, the McMillen Firm, and the Salvatis in the underlying case as well as the extent to which the McMillen Firm bears responsibility for the decision not to name Allied Security as a defendant in that case. The nature of the parties' relationship and the exact nature of the McMillen Firm's responsibility with respect to the underlying case is a factual issue, and therefore, it requires a specific factual inquiry to resolve. In this case, the present parties disagree as to the extent and nature of the McMillen Firm's role in advising the Salvatis regarding legal and tactical aspects of the underlying case. Cal Potter will testify that the McMillen Firm knew of the decision not to name Allied Security and that the McMillen Firm was aware of the reasoning behind it. The McMillen Firm admits that they were primarily responsible for advising the Salvatis in the underlying case regarding all aspects of the case, and that Cal Potter was not to contact the Salvatis directly; rather, he was to contact the McMillen Firm and they, in turn, would speak with the Salvatis. As a result, Cal Potter relied on the McMillen Firm to advise the Salvatis regarding all aspects, legal and otherwise, of the underlying case, including the decision to name only the primary defendant, PEC. If the McMillen Firm improperly advised the Salvatis, due to their lack of knowledge of Nevada law, they should bear responsibility therefore.

The McMillen Firm seeks to shift responsibility for the decision not to name Allied Security as a defendant in the underlying case onto Cal Potter by citing the fact that none of its attorneys are licensed to practice law in Nevada. However, the decision of whether or not to name a particular person or entity as a defendant in a case such as the underlying case does not require specialized knowledge of Nevada law. The McMillen Firm, as competent legal professionals, undoubtedly knew of the possibility of naming Allied Security as a defendant in the underlying case as well as the many considerations for choosing not to name them. Throughout the four years of discovery, the McMillen Firm received numerous opportunities to review the

voluminous factual evidence produced in the case, and they had the opportunity raise any objection they may have had regarding the decision not to name Allied Security.

The McMillen Firm also argues that it cannot be a "joint tortfeasor" with Cal Potter in the present case because Plaintiffs did not name the McMillen Firm directly. However, the Nevada Statute governing contribution does not explicitly require that a party be named by the Plaintiff in order to be jointly liable for a tort claim. Further, the Uniform Joint Obligations Act adopted by Nevada provides that a judgment against one or more joint obligors "does not discharge a co-obligor who was not a party to the proceedings wherein the judgment was rendered." *N.R.S.* 101.030. Accordingly, Cal Potter, if found liable to Plaintiffs for not naming Allied Security in the underlying action, is entitled to contribution from the McMillen Firm for any amount Cal Potter pays in excess of his equitable share of the common liability. The jury in the present action is not bound by Plaintiffs' choice of defendants in the present action in apportioning liability, if any, for Plaintiffs' claims. While Plaintiffs chose not to name the McMillen Firm as a defendant in this present litigation, they could have. Nothing legally barred Plaintiffs from asserting the same causes of action against the McMillen Firm arising out of the purported failure to name Allied Security in the underlying case. In the present case, the jury is free to find, based on the factual evidence presented, that one or more of the present parties shares liability, or that an unnamed person or entity bears some or all of the responsibility for the Plaintiffs' alleged legal malpractice claims.

Neither the McMillen Firm, nor the Salvatis raised an objection to the decision to not name Allied Security as a defendant in the underlying case until PEC's possible insolvency was revealed at a mediation held in late 2002. At mediation, negotiations with PEC included discussion that PEC would file a third-party action against Allied Security, and assign its rights to the Salvatis to pursue any recovery thereunder. Any "loss" for failure to name Allied would have been overcome through PEC's potential contribution action. Yet, Potter was terminated, and the Salvatis failed to follow through on that option, while being advised by the McMillen Firm.

As the attorneys primarily responsible for advising the Salvatis regarding all aspects of the underlying case, the McMillen firm bears equal responsibility with Cal Potter for any purported

failure to name Allied Security as a direct defendant in the underlying action. If the decision not to name Allied Security is deemed to constitute legal malpractice entitling the Salvatis to compensation, Cal Potter is entitled to contribution and/or indemnity against the McMillen Firm.

The McMillen Firm neglects to address Cal Potter's equitable indemnity claims in its Motion for Summary Judgment on the Third Party Complaint, instead focusing on the contribution claims. However, as stated in Cal Potter's Third Party Complaint, the McMillen Firm retained responsibility for the case after Cal Potter no longer assisted in representing the Salvatis. At any time, the McMillen Firm could have effectuated an amendment to the complaint in the underlying action to name Allied Security as a defendant and relied on Rule 15 of the Nevada Rules of Civil Procedure to avoid any conflict with the applicable statute of limitations. NRCP 15 states as follows:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

From the time that the Cal Potter's representation of the Salvatis ended until the Salvatis accepted the settlement from SEC's excess carrier, the McMillen Firm, through new local counsel, could have amended the underlying complaint to add Allied Security as a direct defendant. Since moving party states that the Salvatis "ultimately became dissatisfied with Potter's efforts" (Moving Papers, Page 5, line 16), it is clear that the dissatisfaction came as a result of the communication or advise from the McMillen Firm, which was the sole source of news on the lawsuit to the Salvatis. Cal Potter had no control over the McMillen firm's and the Salvatis' decision not to name Allied Security at that point as a defendant. At that point, the duty of adequate and competent representation of the Salvatis shifted entirely to the McMillen Firm. Any failure to name Allied Security at this point, or to negotiate an assignment of rights from PEC, was the primary responsibility of the McMillen Firm who had initially been hired to prosecute the Plaintiffs' claims in the underlying case.

Based on the foregoing, Cal Potter is entitled to equitable indemnity from the McMillen Firm as the ultimate failure to name Allied Security before the settlement agreement was reached was its responsibility, not Cal Potter's. In *Reid v. Royal Insurance Co.*, 80 Nev. 137, 390 P.2d 45

(1964), the Nevada Supreme Court stated that where the plaintiff's loss is caused solely by the negligence of a third party defendant, the Court "would not hesitate to apply an indemnity principle to shift the entire burden of the loss from the [named defendant] to the [third party defendant]". In the present case, Cal Potter is entitled to indemnity from the McMillen Firm for any purported failure to name Allied Security prior to the time that Plaintiffs accepted a settlement offer from SEC's excess carrier. Absent full indemnity, Cal Potter would be entitled to equitable contribution from the McMillan Firm.

### B. SUMMARY JUDGMENT ON THE PLAINTIFFS' COMPLAINT

With respect to the Plaintiffs' present Complaint, Cal Potter hereby joins in the McMillen Firm's Motion for Summary Judgment on the Plaintiffs' Complaint which is incorporated herein. As aptly argued by the McMillen Firm, summary judgment on Plaintiffs' Complaint is appropriate in this case as there is no genuine issue of material fact with respect to some of the necessary elements of Plaintiffs' legal malpractice claims.

Plaintiffs Complaint alleges legal malpractice claims against Cal Potter for not naming Allied Security as a defendant in the underlying action. Cal Potter named PEC as the sole defendant in the underlying case, as PEC was the owner of the property adjacent to the sidewalk where the assault occurred and, therefore, bore the legal responsibility to provide security to the Salvatis. Pursuant to the contract between PEC and Allied, Allied was to provide uniformed, unarmed security guard, to patrol and protect the property (only) of PEC (See Exhibit 1, Paragraph 6). That contract also required that Allied be named as an additional insured under PEC's insurance policy (See Exhibit 2), and the strictures of the liquidated insurance carrier would have also applied equally to Allied as an Additional Insured.

The decision was made not to name additional potential secondary defendants. This decision was based, in part, on the desire to limit the number of defense attorneys and defense experts fighting Plaintiffs' claims. This tactical decision proved to be wise, as Cal Potter was eventually able to obtain a default against PEC and successfully petitioned the bankruptcy court to lift the automatic stay after PEC itself filed for bankruptcy. Had Cal Potter named Allied, the default taken against PEC would not necessarily have been binding on Allied, and the underlying

case would have been tried on its merits. Cal Potter's efforts enabled Plaintiffs to move forward with their claims and eventually to obtain a default judgment against PEC in excess of $1.8 Million. While the judgment was on appeal, and with new counsel, the Salvatis accepted a settlement of $1.5 Million for all of its claims against PEC.

In order to establish a claim of legal malpractice, the Salvatis must prove, in part, that Cal Potter breached his duty to the Salvatis, and that the breach proximately caused actual loss or damage to the Salvatis. As the McMillen Firm aptly argues in its Motion, the Salvatis have been reasonably and fairly compensated for their claims in the underlying case. The undisputed expert testimony in this case asserts that the $1.5 Million settlement that the Salvatis obtained was fair and represents the reasonable value of the Salvatis' claims in the underlying case. Given the fact that the well-respected mediator in the underlying case felt that the value of the case was approximately $1 Million, it is clear that Plaintiffs have not been harmed as a result of any purported failure to name Allied Security as an additional defendant in the underlying case. The value of Plaintiffs' claims is not increased by virtue of the addition of more defendants in the underlying case. Where naming only the primary defendant will enable a plaintiff to obtain the full value of his or her claims in a particular case, there is little reason to name additional defendants. In fact, it is often prudent not to name additional defendants, as this only increases the quantity, and often quality, of the forces fighting against the plaintiff's claims.

In the underlying case, throughout nearly four years of discovery, Cal Potter had no reason to suspect that PEC or its insurer would become insolvent. And ultimately, PEC's and its insurer's claimed insolvency didn't matter because SEC's excess carrier, with a $20 Million policy available, was solvent and had more than sufficient funds available to compensate the Salvatis for their claims.

///
///
///
///
///

## III.

## CONCLUSION

Based on the foregoing, Cal Potter respectfully requests that this Honorable Court deny the McMillen Firm's Motion for Summary Judgment on the Third Party Complaint and grant the Motion for Summary Judgment on Plaintiffs' Complaint.

Dated: October 16, 2007

JACKSON & WALLACE LLP

By: _____
STEVEN R. BARTELL, ESQ.
Nevada Bar No. 7271
JAKE D. KELSEY, ESQ.
Nevada Bar No. 9076
3753 Howard Hughes Parkway, #200
Las Vegas, NV 89169
(702) 889.6363
Attorneys for Defendant/Third Party Plaintiff
Cal. J. Potter, III; Cal. J. Potter, III, Esq., Chtd.
d/b/a Potter Law Offices

JACKSON & WALLACE LLP
LAS VEGAS, NEVADA

1441438v1

10

OPPOSITION AND JOINDER IN MOTIONS
FOR SUMMARY JUDGMENT
CV-S-05-0811-RCJ-(LRL)

# PROOF OF SERVICE

## LR 5-1(a)

<u>SALVATI v. POTTER., et al.,</u>
USDC NEV. Case No. CV-S-05-0811-RCJ-LRL

CERTIFICATE OF MAILING

I hereby certify that on October 19, 2007, I caused to be mailed a copy of the foregoing

**DEFENDANT'S/THIRD PARTY PLAINTIFF'S OPPOSITION TO THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE THIRD PARTY COMPLAINT**

AND

**JOINDER IN THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFF'S COMPLAINT**

in a sealed envelope, via U.S. mail service to the following Nevada counsel of record:

KRISTINA S. HOLMAN, ESQ.
4475 South Pecos Rd. 3742
Las Vegas, NV 89121

RILEY A. CLAYTON, ESQ.
6655 West Sahara Ave., Suite E-102
Las Vegas, NV 89146

JAMES E. DE PASQUALE, ESQ
906 Grant Building
Pittsburgh, PA 15219

and that postage was fully prepaid thereon.

Furthermore, on this same date, I additionally caused same to be faxed to counsel of record pursuant to a written agreement to accept fax service in accordance with NRCP 5.

By: /s/ Janel B. Bradshaw
Employee of Jackson & Wallace LLP

# EXHIBIT 1

# EXHIBIT 1



## SERVICE AGREEMENT

THIS AGREEMENT is made as of the __12th__ day of __February__, 19 __97__, by and between ALLIED SECURITY INC., a corporation, having its principal place of business at __1515 E. Tropicana #395  Las Vegas, NV 89119__ (hereinafter called "Contractor").

__PREFERRED EQUITIES CORPORATION__  
__Ramada Vacation Suites__  AND  a __Corporation__ having its principal place of business at __4310 Paradise Rd.  Las Vegas, NV 89109__ (hereinafter called "Client").

### RECITALS

A. The Client desires Contractor to provide security personnel to perform duties as mutually agreed upon herein at designated premises owned or leased by the Client, or any of its affiliated companies, at __100 Winnick Ave.  Las Vegas, NV  89109__ (address) and at such other locations as listed on the attached Schedule "A" (such location(s) being hereafter referred to as the "Property") and,

B. The Contractor desires to provide said personnel to perform such tasks.

### AGREEMENT
The parties do mutually agree as follows:

1. Contractor shall furnish security personnel to perform such duties with principal posts and hours of duty as requested in writing by the Client. If the Client changes the time or amount of coverage originally requested, alters the duties of the Contractor's personnel, or the nature of the Client's environment changes, the Contractor reserves the right to renegotiate the contract upon notice of such change.

2. Contractor is an independent contractor and as such personnel provided hereunder are employees of Contractor. Contractor shall pay all wages, Federal and State taxes, local occupational license taxes, unemployment benefits, disability benefits, social security benefits, old age benefits, and any other payments which employers are normally obligated to pay on behalf of their own employees, and Contractor hereby agrees to indemnify and hold the Client harmless from the payment thereof.

3. To the extent security personnel are assigned or assume duties at Client's request, other than those agreed upon in writing by Contractor, Client shall assume complete responsibility and liability for any claims or losses arising, directly or indirectly, therefrom. Contractor agrees to remove its personnel at Client's request and Client agrees to indemnify and defend Contractor for any and all claims, charges and losses arising therefrom.

4. Contractor shall provide personnel capable of performing their duties and shall be entitled to provide personnel for that purpose without regard to an individual's race, color, creed, sex, age, national origin or other condition or circumstance protected under any relevant federal, state or local law.

5. Client understands and agrees that the Contractor is not an insurer; that, if desired, insurance may be obtained by the Client on its own account through its own insurer; that the sums payable under this Agreement to the Contractor are based upon the value of the services offered and are unrelated to the value of Client's Property or that of others located in or about the Property; that the sums charged by the Contractor are insufficient to guarantee that no loss will occur; that the services are consistent with Client's request as an element of Client's security program; and, the Contractor makes no warranty or guarantee, implied or otherwise, that no loss will occur or that the services provided will avert or prevent occurrences or losses which the services are designated to help detect or avert.

6. The services provided under this Agreement are solely to protect the Property of Client and are solely for the benefit of the Client and Contractor shall be liable for damage or loss of Client Property only to the extent caused by the sole negligence of Contractor or its employees. Neither this Agreement nor any services rendered hereunder shall give rise to, or shall be deemed to or construed so as to confer any rights on any other party as a third party beneficiary or otherwise and Client agrees to indemnify and hold harmless the Contractor against any claims by such third parties regardless of the acts or omissions or negligence of Contractor, its officers, agents and employees. Notwithstanding anything to the contrary herein, Contractor shall not be liable for any loss caused by a criminal act, of any person, whether or not related to the negligence or intentional act or omission of Contractor or its employees; nor shall Contractor's liability for any loss exceed Contractor's insurance proceeds. Contractor's certificate of insurance shall be made available for informational purposes upon Client's written request. In the event Client desires Contractor to modify the terms setforth herein or seeks additional coverage, the parties shall enter into a separate written agreement providing therefor and additional compensation shall be due and owing to Contractor as set forth therein.

7. In the event Client requires the Contractor's personnel to drive any vehicle during the course of their duties other than vehicles furnished by Contractor, the Client agrees (i) to maintain automobile insurance in the amount of $1,000,000 combined single limit; (ii) that Client's automobile liability policy including comprehensive and collision coverages shall name Contractor and its employees as additional insureds; (iii) that Client's insurance shall be primary and that Client on its behalf and on behalf of its insurers shall waive all rights of recovery from the Contractor; and (iv) to indemnify, defend and hold Contractor, its officers, agents and employees, harmless from any and all such losses, claims, suits, damages (including those of passengers and the drivers of such vehicle), and expenses which may arise out of the use of Client's vehicles, irrespective of the acts or omissions, negligent or otherwise, of Contractor's employees.

8. The Client agrees to name Contractor and its employees as additional insureds on all insurance policies maintained by Client covering occurrences on Client's premises and Client, on its own behalf and on behalf of its insurers waives (i) any and all rights of subrogation that any insurer of the Client may have against the Contractor; (ii) its rights to implead Contractor in any action brought by a third party against Client for any reason whatsoever; (iii) any rights to recover consequential or special damages; and (iv) any rights of recovery of damages whether or not covered by Client or Contractor's insurance policies. Client's insurance policies shall be primary. Under no circumstances shall either party be liable for any loss (including such resulting from Contractor's non performance) related, directly or indirectly, to an Act of God.

9. Client agrees to pay Contractor the following rates plus all applicable sales, use and/or similar taxes:

| Personnel or Equipment | Rate (Regular/Overtime) |
|---|---|
| Uniformed, Unarmed Security Personnel as follows: | |
| Site Supervisor (40) Hours Per Week | 9.53/13.34 |
| Security Officer (464) Hours Per Week | 8.90/12.46 |

Holiday rates of $ 13.34 S. Supv / 12.46 Security Officer shall apply on the following checked holidays:

- _X_ New Year's Day
- _X_ Labor Day
- ___ Martin Luther King Day
- ___ Other: _____

- _X_ Easter Sunday
- _X_ Thanksgiving Day
- ___ Good Friday

- _X_ Memorial Day
- _X_ Christmas Day
- ___ Columbus Day

- _X_ Independence Day
- ___ President's Day
- ___ Veteran's Day

10. Contractor will bill Client on a regular basis with invoices payable upon receipt, and without offset, at the address specified on the invoice. Any dispute or claim regarding the amount of an invoice or the underlying services rendered must be sent in writing by the Client to Contractor within seven (7) days from the invoice date, setting forth the nature of the dispute and including all supporting documentation, or it shall for all purposes be deemed waived by the Client. Client agrees to pay a late fee of 1-1/2% per month (or any part thereof) plus all collection and attorneys fees and costs which may be incurred by Contractor in the collection of any invoice(s) not paid pursuant to the terms of this paragraph. For purposes of this paragraph, time is of the essence.

11. Client acknowledges that Contractor has spent considerable time and expense in recruiting and training its employees and, accordingly, it is agreed that the Client shall not during the term of this Agreement and any renewal period thereof and for a period of one (1) year from the expiration thereof, place in its employ, directly or indirectly, any employee furnished by the Contractor to Client during the term of this Agreement or any renewal thereof. In the event of a breach of this provision by the Client, Client shall pay the Contractor the average weekly billing for such employee for four (4) months as liquidated damages together with all legal fees, costs and disbursements arising from the breach of this provision.

12. This Agreement shall be for a period of one (1) year, commencing on the __12th__ day of __February__, 19__97__ and terminating on the __5th__ day of __February__, 19__98__ ("Termination Date"); provided, this Agreement will automatically be renewed if neither party terminates this Agreement upon written notice at least sixty (60) days prior to the termination date of this Agreement or any renewal. In the event Client terminates this Agreement for any reason, other than as set forth herein or for the documented material breach by Contractor, Client agrees to pay as liquidated damages an amount equal to Contractor's billing to Client for sixty (60) days of services for the period from the date Contractor receives such notice until services actually cease. Contractor may terminate this agreement at anytime upon sixty (60) days prior written notice.

13. It is further understood between the parties hereto that if as a result of any federal, state or local law, regulation, ruling or agreement Contractor increases wages, incurs higher payroll related expenses, or provides benefits greater than those prevailing at the time of the execution of this Agreement, then upon thirty (30) days' written notice to the Client, Contractor may increase its charge to the Client, penny for penny, for such additional costs and increases arising therefrom.

14. Should Client require Contractor's security personnel to perform any services outside the scope of services as agreed upon under Paragraph 1 hereof (e.g., labor strike services), a separate billing rate shall be established for such services as Client and Contractor shall mutually agree. Should Client require Contractor to provide coverage by security personnel in addition to the coverage originally agreed upon in Paragraph 1 hereof and Contractor is given less than __24__ hours prior notice of such additional services, then such personnel shall be billed at $__13.34__ Supv / __12.46__ S. Officer per hour, until such time as __48__ hours has elapsed from the time of the first notice to Contractor.

15. Notwithstanding any other provision of this Agreement, if the Client fails to pay Contractor's invoices within thirty (30) days from the invoice date, or if at any time during the term of this Agreement there shall be filed by or against Client in any court, pursuant to any statute, either of the United States, or of any State, territory or possession, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver to receive all or a portion of Client's Property; or if Client makes an assignment for the benefit of creditors; or, if Contractor ...eason to believe that Client will not or cannot pay its payables to Contractor, Contractor reserves the right to discontinue this service at any time, without notice or liability until payments ...have been made in a manner satisfactory to Contractor. Contractor's failure to exercise said option on any one or more occasions shall not constitute a waiver of the right to exercise it at a later date, nor be deemed to create a custom of deferred payment.

16. Prior to Contractor commencing services, Client agrees to provide Contractor's personnel with information concerning any hazards, hazardous substances, or chemicals on Client's premises or in the work areas through which Contractor's personnel may be required to pass during the performance of their duties under this contract (collectively, "Hazardous Conditions"). The information supplied by Client shall be sufficient to meet the requirements of the OSHA Hazard Communication Standard, 29 C.F.R. 1910, 1200 et seq., and any other applicable federal, state and local laws and regulations. Such information shall be updated by Client as required by law. Client further agrees to provide for Contractor's personnel to participate, without cost to Contractor, in any hazard communication or safety training that Client provides for its employees. Client assumes all responsibility and agrees to indemnify, defend and hold Contractor and its employees harmless for all injuries to persons (including Contractor's employees), claims and fines, directly or indirectly, arising out of or related to Hazardous Conditions.

17. In the event of any ambiguity or conflict between this agreement and any other agreement or understanding between the parties, the terms of this agreement will prevail. This agreement supersedes all prior agreements, oral or written, between Contractor and Client, and represents the whole and entire agreement between the parties. No other agreements or representations are binding on the parties hereto. This agreement may not be altered, modified or amended, except in a writing properly executed by an authorized representative of Contractor and Client. As an inducement to entering into this Agreement, if the Client is a proprietorship, partnership, limited partnership or agent for a third party the person executing this Agreement on behalf of Client personally guarantees the performance of Client's obligations herein.

18. Client hereby consents to the exclusive jurisdiction of any state or federal court located within the County of Allegheny, State of Pennsylvania, and irrevocably agrees that all actions or proceedings arising out of or relating to this agreement shall be litigated in such courts. Client accepts for itself generally and unconditionally, the jurisdiction of the aforesaid courts and waives any defense of forum non conveniens, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. Client agrees to accept service served by certified mail, return receipt requested, mailed to the address indicated above or the Client's last known address, if different, such service being hereby acknowledged by Client to be effective and binding service in every respect. Nothing herein shall affect the right to serve process in any other manner permitted by law. Unless otherwise prohibited by law, no action or claim by Client shall be commenced against Contractor more than eighteen (18) months from the date of the occurrence giving rise to such action or claim.

19. Any and all notices under this Agreement shall be sent by registered or certified mail, return receipt requested, to the other party at the address hereinabove first written and, if to Contractor, with a copy to Allied Security, Inc., 2840 Library Road, Pittsburgh, PA 15234, Attn: Vice President.

20. In the event any provision of this Agreement shall be found to be invalid or unenforceable, such provision shall be deemed amended to the extent required to render it valid and enforceable, and the remainder of this Agreement shall continue in full force and effect. The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver of such provision or of the right of either party thereafter to enforce such provision or any other provision of this Agreement.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have set their hands as of the day first above written.

CONTRACTOR
By: _[signature]_
    Peter L. Seebold, Sr., CPP
Title: Branch Manager

CLIENT
By: _[signature]_
Name: _[signature]_
Title: _[signature]_

(Rev. 5/96)

# EXHIBIT 2

# EXHIBIT 2

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YY): 9/25/97

**PRODUCER**
Sedgwick James of Nevada Inc.
3380 W. Sahara Ave., Suite 100
Las Vegas, NV  89102

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**COMPANIES AFFORDING COVERAGE**

| | |
|---|---|
| COMPANY A | Reliance Insurance Company |
| COMPANY B | Federal Insurance Company |
| COMPANY C | |
| COMPANY D | |

**INSURED**
Preferred Equities Corporation
Attention: J. Goldstein
4310 Paradise Road
Las Vegas  NV  89109

## COVERAGES

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE  X OCCUR<br>☐ OWNER'S & CONTRACTOR'S PROT | GB8492883 | 7/15/97 | 7/15/98 | GENERAL AGGREGATE<br>PRODUCTS - COMP/OP AGG<br>PERSONAL & ADV INJURY<br>EACH OCCURRENCE<br>FIRE DAMAGE (Any one fire)<br>MED EXP (Any one person) | $ 2000000<br>$ 1000000<br>$ 1000000<br>$ 1000000<br>$ 300000<br>$ None |
| A | AUTOMOBILE LIABILITY<br>X ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | GA8492883 | 7/15/97 | 7/15/98 | COMBINED SINGLE LIMIT<br>BODILY INJURY (Per person)<br>BODILY INJURY (Per accident)<br>PROPERTY DAMAGE | $ 1000000<br>$<br>$<br>$ |
| | GARAGE LIABILITY<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT<br>OTHER THAN AUTO ONLY:<br>EACH ACCIDENT<br>AGGREGATE | $<br>$<br>$ |
| B | EXCESS LIABILITY<br>X UMBRELLA FORM<br>☐ OTHER THAN UMBRELLA FORM | 9879651725 | 7/15/97 | 7/15/98 | EACH OCCURRENCE<br>AGGREGATE | $ 20000000<br>$ 20000000<br>$ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>THE PROPRIETOR/ ☐ INCL<br>PARTNERS/EXECUTIVE<br>OFFICERS ARE:  ☐ EXCL | | | | WC STATU-TORY LIMITS / OTHER<br>EL EACH ACCIDENT<br>EL DISEASE - POLICY LIMIT<br>EL DISEASE - EA EMPLOYEE | $<br>$<br>$ |
| | OTHER | | | | | |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS**
Allied Security, Inc. is named as an additional insured

**CERTIFICATE HOLDER**
Allied Security, Inc.
3344 Spring Mountain Road
Building C, Suite 256
Las Vegas, NV  89102

**CANCELLATION**
SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE
*Donna G. Flechting (signature)*

ACORD 25-S (1/95)            © ACORD CORPORATION 1988
CERT5S_1


DEPOSITION EXHIBIT

Salvati v PEC PEC Files
PEC 06627